No. 23-1384

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

APPALACHIAN VOICES; WILD VIRGINIA; WEST VIRGINIA RIVERS
COALITION; PRESERVE GILES COUNTY; PRESERVE BENT MOUNTAIN,
a chapter of Blue Ridge Environmental Defense League; WEST VIRGINIA
HIGHLANDS CONSERVANCY; INDIAN CREEK WATERSHED
ASSOCIATION; SIERRA CLUB; CHESAPEAKE CLIMATE ACTION
NETWORK; and CENTER FOR BIOLOGICAL DIVERSITY

*Petitioners,*

v.

UNITED STATES DEPARTMENT OF THE INTERIOR;
DEB HAALAND, in her official capacity as Secretary of the U.S. Department of
the Interior; UNITED STATES FISH AND WILDLIFE SERVICE, an agency of
the U.S. Department of Interior; MARTHA WILLIAMS, in her official capacity as
Director of the U.S. Fish and Wildlife Service; and CINDY SCHULZ, in her
official capacity as Field Supervisor, Virginia Ecological Services, Responsible
Official

*Respondents,*

and

MOUNTAIN VALLEY PIPELINE, LLC,

*Intervenor.*

## PETITIONERS' MOTION FOR STAY OF RESPONDENT
## U.S. FISH AND WILDLIFE SERVICE'S BIOLOGICAL OPINION AND
## INCIDENTAL TAKE STATEMENT

Despite this Court's warning to the U.S. Fish and Wildlife Service ("FWS")

that it "may not press on the gas" when "a species is already speeding toward the

extinction cliff," *Appalachian Voices v. U.S. Dept. of the Interior*, 25 F.4th 259, 279

(4th Cir. 2022), the agency's foot remains firmly on the pedal in its latest review of the Mountain Valley Pipeline (the "Pipeline"). Accordingly, pursuant to Federal Rule of Appellate Procedure 18(a), Petitioners seek a stay of FWS's February 28, 2023 Biological Opinion ("BiOp") and Incidental Take Statement ("ITS") (Ex. A). Respondents and Respondent-Intervenor Mountain Valley Pipeline, LLC ("MVP") oppose this motion.

## INTRODUCTION

MVP is constructing approximately 304 miles of 42-inch diameter gas pipeline across West Virginia and Virginia. MVP continued construction—including cutting a 125-foot-wide right-of-way through forests and over highly erodible steep slopes— even after this Court vacated several of its required federal authorizations.[1] That construction has led to widespread sedimentation and violations of water quality standards in streams adjacent to MVP's construction activities. *Sierra Club v. W. Va. Dept. of Envtl. Prot.*, 64 F.4th 487, 2023 WL 2746769, *4 (4th Cir. 2023).

Pipeline construction indisputably degrades the habitat of the endangered candy darter and Roanoke logperch, and destroys the habitat of imperiled bat species. And those species are in a precarious position. For candy darters, which are "particularly sensitive" to increased sedimentation, BiOp at 211, the "risk of

---

[1] MVP's FERC certificate includes a condition this Court has construed to prohibit construction in the absence of required federal authorizations. *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 285 n.11 (4th Cir. 2018).

extinction is high." Ex. B at 5. And FWS acknowledges the Pipeline harms populations "essential to the recovery of the species." BiOp at 147. Similarly, FWS predicts the project would degrade 21.8 kilometers of Roanoke logperch habitat housing populations that "underpin the recovery of the species." *Id*. at 136. The Indiana bat ("Ibat") is also at risk of extinction, and the Appalachian Mountains Recovery Unit population declined from 32,465 bats in 2011 to 1,996 in 2019. *Id.* at 72, 244. Similarly, the northern long-eared bat ("NLEB") has suffered population declines of 97-100% across 79% of its range, and its "viability is likely to rapidly decline over the next 10 years." *Id*. at 76, 81. Those declines are exacerbated by habitat loss caused by Pipeline construction, increasing the risk that those species will be lost forever.

Despite those risks, and the extensive habitat degradation *already* caused by MVP, FWS has repeatedly failed to adequately assess effects on the species. This Court stayed FWS's first biological opinion on October 11, 2019, and vacated the second on February 3, 2022. Despite this Court's clear directives, FWS issued a third inadequate biological opinion on February 28, 2023.

Although still lacking necessary authorizations from the U.S. Forest Service, Bureau of Land Management, and U.S. Army Corps of Engineers, MVP is nonetheless preparing to proceed with construction, including in watersheds that contain endangered species' habitat.

3

On April 27, 2023, FWS denied Petitioners' request for an administrative stay. Exs. C, D. Petitioners therefore seek a stay to ensure Pipeline construction does not cause irreparable harm pending review of the latest deficient biological opinion.

## ARGUMENT

Whether to issue a stay turns on consideration of four factors: (1) whether the applicant is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether a stay will substantially injure other parties; and (4) the public interest. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). Petitioners meet all four factors.

## I.    Petitioners are Likely to Succeed on the Merits.

### A.    FWS Failed to Properly Consider the Baseline Condition of the Candy Darter in its Jeopardy Analysis.

In its opinion vacating the prior biological opinion, this Court explained that "if a species is already speeding toward the extinction cliff, an agency may not press on the gas," and urged FWS "to consider this directive carefully while reassessing impacts to the two endangered fish at issue, especially the apparently not-long-for-this-world candy darter." *Appalachian Voices*, 25 F.4th at 279. In the new BiOp, FWS pushes back against this directive, and indeed attempts to side-step the clear requirements of the Endangered Species Act ("ESA") by downplaying the species' baseline condition and relying only on the Pipeline's effects for its jeopardy determination. *See* BiOp at 260 ("Even when a species faces significant threats

unrelated to the proposed action, the jeopardy analysis focuses on the effects of the action…."); *id.* at 261 ("So at all times, the proposed action, not baseline conditions, is the subject of the jeopardy determination."). FWS's position is, once again, contrary to the statute and regulations. *See Appalachian Voices*, 25 F.4th at 279; *see also* 50 C.F.R. §402.14(g)(4); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 930 (9th Cir. 2008).

Indeed, FWS "must '*[a]dd* the effects of the action and cumulative effects to the environmental baseline and[,] *in light of* the status of the species and critical habitat, formulate [its] opinion as to whether the action is likely to jeopardize the continued existence of [the] listed species.'" *Appalachian Voices*, 25 F.4th at 271 (emphasis in original) (quoting 50 C.F.R. §402.14(g)(4)). Accordingly, "when baseline conditions or cumulative effects are 'already jeopardiz[ing] a species, an agency may not take action that *deepens* the jeopardy by causing additional harm.'" *Id.* at 279 (citation omitted). Here, however, FWS misconstrues the applicable analysis to support an erroneous determination for a project that will certainly cause additional harm to the survival and recovery of a species on the brink of extinction.

Under baseline conditions, "[t]he risk of extinction is high" for the darter, Ex. B at 5; FWS has predicted the species likely will be "functionally extinct" within 25 years. Ex. E at 67. Candy darters "are particularly sensitive to changes resulting from increased sedimentation." BiOp at 211. Even under FWS's optimistic projections

(which rely on MVP's flawed modeling), the Pipeline "will harm or kill" darters and "alter/degrade" large swaths of their critical habitat, *id.* at 209, from "exposure to degraded surface water quality and elevated suspended sediment and sedimentation." *Id.* at 283. Studies have found "candy darter presence and population 'robustness' is correlated with low levels of sedimentation and stream bottom embeddedness." Ex. E at 38. Importantly, the affected populations are "among the most genetically pure populations," giving them "added importance…for the future conservation and recovery of the species." BiOp at 144-45. The degraded conditions will last years, and may be permanent, exacerbating the species' decline and hampering its recovery. *See* section I.C, *infra*; BiOp at 205 (acknowledging "sediment can remain in the river-floodplain system" for "decades to centuries"); *id.* at 192, 269 (acknowledging adverse impacts, including to fish spawning, when sediment is later re-suspended and re-deposited downstream); Ex. F at 7 (acknowledging the "importance of sedimentation…to both the [darter's] historic decline and its future probability of persistence"). The Pipeline will further jeopardize the species' recovery by increasing embeddedness in historically occupied darter streams that are candidates for repatriation. Ex. E at 39.[2]

---

[2] FWS minimizes this risk without support or analysis in the new BiOp. *See* BiOp at 267.

FWS's determination is thus unlawful because it fails to properly "add" the baseline conditions (high risk of extinction) to this project's effects (take of individuals in important populations and degradation of current and historical habitat) and cumulative effects (which FWS failed to adequately evaluate, *see infra* at I.D). *See* BiOp at 260-61. Therefore, FWS once again failed to follow the legally prescribed formula, and the BiOp is arbitrary, capricious, and otherwise not in accordance with law. 5 U.S.C. §706(2)(A).

### B.    FWS Ignored Real-World Information and MVP's Violation History.

An essential part of the BiOp is FWS's effort to predict the Pipeline's effects on Roanoke logperch, candy darter, and candy darter critical habitat. BiOp at 189-220. Those predictions relied heavily on MVP's sediment modeling, and parroted MVP's claim that its modeling "is conservative and overestimates the expected increased sediment concentrations." *E.g.*, *id.* at 201. But this is belied by real-world information that undermines the validity of MVP's model. FWS thus committed the same mistakes that led this Court to vacate MVP's 2021 authorizations for the Jefferson National Forest and its 2021 Section 401 certification from West Virginia. Indeed, the modeling on which FWS relied was the same modeling at issue in the Forest Service case, BiOp at 192-93; yet, like the Forest Service, FWS ignores "evidence of the Pipeline's actual impacts" that indicates the "modeling is

unreasonable." *Wild Virginia v. U.S. Forest Serv.*, 24 F.4th 915, 927-28 (4th Cir. 2022).

For example, FWS did not grapple with "USGS data show[ing] water turbidity values that were 20% higher downstream from the Pipeline's construction than upstream -- a significant difference from the 2.1% increase in sedimentation the hydrologic analyses predicted for the Roanoke River." *Id*. at 924 (footnote omitted). Nor did FWS consider an expert report analyzing data from the Roanoke River sensors during two storm events in 2019 and finding that turbidity "increased by 20% to 150% during construction in contrast to the 0.1% to 2.6% increase in sediment yield" predicted by MVP's modeling. Ex. G at 20.[3] That report also analyzed data from an August 2022 storm event in the Little Stony Creek watershed, finding a more than 200% increase in turbidity from the upstream sensor to the downstream sensor, "in contrast to the 0.1% to 2.6% increase in sediment yield suggested by" MVP's modeling.[4] *Id.* at 21-22. Consequently, the BiOp is arbitrary and capricious. *Wild Virginia*, 24 F.4th at 927-28.

---

[3] This February 2023 report was submitted to FWS on February 21, 2023. FWS states that it did not "meaningfully consider[]" the report and other relevant materials. BiOp at 3.

[4] FWS also ignored evidence explaining *why* MVP's modeling is inconsistent with real-world outcomes. For example, the model "is most applicable for slopes less than 20%," whereas much of the Pipeline route traverses significantly steeper slopes. Ex. G at 12. *See also id*. at 16; Ex. H at 9-12.

FWS also fails to grapple with MVP's long history of violations and other sedimentation problems. *See, e.g.*, Ex. G at 24 (noting "multiple instances of streams in the Roanoke River watershed with sedimentation along thousands of feet of up to several inches thick"); Exs. I, J (West Virginia consent orders); Ex. K at 24-31; Ex. V at Ex. 1. In the face of a history of noncompliance, "it is arbitrary and capricious for an agency to predict compliance without a rational explanation." *Sierra Club*, 2023 WL 2746769, *8. Here, rather than address MVP's checkered violation history, FWS accepts without explanation MVP's claim that it "has committed to increased [erosion and sediment] control inspection frequency and an accelerated deadline to repair ineffective controls." BiOp at 193. But that has no legs. FWS's reliance on MVP's representations that it increased its inspection frequency and would repair ineffective controls within 24 hours, BiOp at 38, provides no additional protections because these "proposed self-inspections are no more frequent than they were" when the violations occurred, and indeed MVP has proposed "*reducing* self-inspection frequency from once a week to 'every 14 days for restored areas.'" *Sierra Club*, 2023 WL 2746769, *9. And MVP has *always* been obligated to repair erosion controls either immediately or within 24 hours, which likewise failed to prevent the prior violations. Ex. L at 13, 19 (requiring immediate repairs to BMPs); Ex. M at 9 (requiring repairs within 24 hours or as soon as conditions allow).

Rather than grappling with the real-world information, FWS instead notes that the Forest Service and BLM administrative response to *Wild Virginia* is ongoing, and that MVP "disputes the assertions" related to real-world information. BiOp at 193. Such excuses ignore reality: the record reveals the modeling underestimates the Pipeline's sediment impacts. Agencies must at least "acknowledge[] th[e] disparity [between the real-world data and the model's predictions] and explain[] its impact on the agencies' reliance on the sedimentation data in the hydrologic analysis." *Wild Virginia*, 24 F.4th at 928. FWS did not do so here. Moreover, because FWS's BiOp "fail[s] to dispel the tension between MVP's checkered past and its confidence in MVP's future compliance," it is arbitrary and capricious. *Sierra Club*, 2023 WL 2746769, *8.

Finally, the BiOp is also arbitrary and capricious because FWS failed to consider real-world evidence contrary to its conclusions about MVP's open-cut crossing of the North Fork of the Roanoke River.[5] Although the BiOp claims there is no indication of streambed impacts from that crossing, BiOp at 199, FWS (like the West Virginia Department of Environmental Protection) was on notice through public comments of sedimentation downstream from that crossing nearly 40

---

[5] The BiOp recognizes this crossing as the only "stream supporting suitable RLP habitat…impacted from instream open-cut construction activities[.]" BiOp at 36.

months after its completion. *Sierra Club*, 2023 WL 2746769, *14; Ex. N at 58-62.[6]

FWS's conclusion is therefore once again unsupported and contrary to real-world

data, which establishes significant sediment deposits downstream from the Nork

Fork Roanoke River crossing.

Indeed, Petitioners submitted materials to FWS about persistent sediment

deposition approximately 1,730 m downstream from the constructed crossing—

beyond FWS's predicted impact area. Ex. N at 58-62. Citizen monitors detected a

"sudden – and catastrophic – change" in sedimentation and turbidity downstream

from the North Fork crossing on the day of its construction. Ex. O at 12. And MVP

even admits that its crossing construction caused sedimentation problems. Ex. N at

61. Post-construction, a trained citizen monitor has frequently visited the

monitoring location downstream of this crossing and regularly observes sediment

deposits at that location. *Id.* at 60. Photos taken during a November 2021 visit

show "[w]hat was once a cobbled streambed…now embedded and clogged with

sediment." *Id.* (internal quotation marks omitted).

Thus, FWS was confronted with "real-world evidence of sedimentation

effects persisting downstream of a completed MVP open-cut, dry-ditch crossing

for **nearly 40 months after the completion of the crossing**." *Id.* (emphasis

_____

[6] In August 2022, Petitioners' counsel provided to FWS a copy of public comments
on MVP's Section 404 application that addressed persistent sediment deposits
downstream of the completed North Fork Roanoke crossing. *See* Ex. H at 2, n.5.

original). Nonetheless, the agency concluded there is "no indication" of streambed

impacts from this crossing. BiOp at 199. That conclusion—and FWS's effects

determination based on it—are necessarily arbitrary and capricious because FWS

entirely failed to grapple with contrary record evidence. *Sierra Club*, 2023 WL

2746769, *8.

      **C.**    **FWS Ignored the Best Available Science Regarding the Severity and Duration of Impacts from Multiple Sources of Disturbance in a Watershed.**

FWS arbitrarily concluded that effects to benthic invertebrates (the darter and

logperch's food source) will persist for no more than four years, and thus would not

jeopardize the species. *See, e.g.*, BiOp at 210. To reach that conclusion, FWS relied

on studies monitoring the downstream impact of discrete pipeline crossing

construction sites. *Id.* at 200, 202. But FWS misconstrues or flatly ignores the best

available scientific evidence showing the Pipeline's multiple crossings and sources of

sedimentation within the same watershed will have longer-term and potentially

permanent impacts on those critical food resources.

FWS's four-year estimate relies on Levesque and Dube (2007), which cited a

study involving a single pipeline stream crossing in England where adverse effects

persisted for four years. Ex. P at 399. But Levesque and Dube (2007) specifically

warned that, in contrast to single crossings,

> [c]*onstruction of multiple crossings* on a stream or river, or *within a watershed*…has the potential for cumulative effects on that system. In

such cases, the capacity of the system to recover from impact may be exceeded, and *the detrimental effects of crossing construction permanent*. The same may be said for the frequency of crossing construction within a given system; *rivers and streams will have limited capacities to recover from multiple impacts*.

*Id.* at 407 (emphasis added). Citing this study, a senior endangered species biologist in FWS's West Virginia Field Office cautioned that "multiple crossings or multiple sources of disturbance and sedimentation in a watershed can have cumulative effects on fish survival and reproduction that exceed the recovery capacity of the river, resulting in *permanent* detrimental effects." Ex. Q at 4 (emphasis added). FWS failed to address that concern in the BiOp.

This project indisputably involves "multiple sources of…sedimentation in a watershed," *id*., including both from multiple crossings within watersheds (*see, e.g*., Ex. H at 16) and from repeated instances of runoff from upland areas (which is "a predominant cause of increased sedimentation" for this project). BiOp at 199, 53. Therefore, the four-year estimate based on the single crossing analyzed by Levesque and Dube is not based on the best available science where, as here, there are multiple crossings and sources of sedimentation in the same watershed. This misconstruction of the science is clearly arbitrary and capricious. *See Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) ("FWS cannot ignore available biological information…which may indicate potential conflicts between development and the preservation of protected species.… To hold otherwise would eviscerate Congress'

intent to 'give the benefit of the doubt to the species'") (citations omitted). And even if there were uncertainty about the threat of permanent detrimental effects from multiple crossings and sources of sedimentation in the same watershed, FWS should have resolved that uncertainty in favor of the species. *Id*. Instead, FWS mischaracterizes the state of the science indicating that the impacts from numerous crossings within a watershed, combined with repeated impacts from upland disturbance, are more severe and longer-lasting than impacts from constructing a single pipeline crossing. 5 U.S.C. §706(2)(A).

### D.     FWS Failed to Properly Evaluate Cumulative Effects.

FWS failed to properly evaluate cumulative effects—those effects of future non-federal activities "that are reasonably certain to occur within the action area." 50 C.F.R. §402.02. That deficiency is fatal because FWS must "formulate its biological opinion as to whether the action, *taken together with cumulative effects*, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F.Supp.2d 1122, 1155 (E.D. Cal. 2008) (emphasis added); *see also* 50 C.F.R. §402.14(g)(4). Proper evaluation of cumulative effects "is critical to ensure that the action is not analyzed 'in a vacuum.'" *Appalachian Voices*, 25 F.4th at 278 (citation omitted).

FWS makes no attempt to evaluate the magnitude or extent of impacts that future non-federal activities will have within the MVP aquatic action area. FWS predicts such activities will disturb 2,578 acres of land in the relevant HUC-12[7] areas for the darter, and 3,520 acres for the logperch. BiOp at 232, 225-27. FWS acknowledges "increased sedimentation" is the "primary effect" of both the Pipeline and these future activities.[8] *Id*. at 263; *see also id*. at 232 (increased sedimentation and embeddedness caused by these activities may reduce darter foraging and spawning efficiency and degrade critical habitat). But rather than take the required next step and analyze their actual impact within stream reaches also affected by the Pipeline, FWS simply asserts that "[t]he extent and intensity of these activities and the associated disturbances and effects in the action area are uncertain." *Id*. at 228, 232.

FWS nonetheless concludes that these "uncertain" cumulative effects "do not pose a significant risk" to the affected fish populations and are "unlikely to significantly alter the[ir] baseline condition." *Id*. at 235; *see id*. at 231. That conclusion is flawed for at least two reasons. ***First***, it fails to give the benefit of the

---

[7] A "hydrologic unit code" is a "hierarchical, numeric code that uniquely identifies hydrologic units."
https://enviroatlas.epa.gov/enviroatlas/glossary/glossary.html#huc.

[8] Sedimentation is already "a problem in many streams within the range of the [darter]," and "ongoing threats," including "stream degradation[,] make the recovery potential low for [the darter] in the near term." BiOp at 89, 90-91.

doubt to the species in light of the uncertainty FWS identified. *See Conner*, 848 F.2d at 1454. ***Second***, FWS zooms out too far in its analysis. To arrive at its conclusion, FWS first calculates the acreage disturbed by future activities as a percentage of the HUC-12s. For example, FWS calculates that future activities will result in the loss of 4.45% of forest cover in the Panther Creek-Gauley River HUC-12 (darter), and will disturb 7.72% of the Owens Creek-Pigg River HUC-12 (logperch). BiOp at 233, 227. Without any explanation, FWS concludes these percentages show the activities will have a "relatively small" extent of impact in the action area. *Id*. at 231, 235.[9]

This unlawfully ignores the actual impact these land-disturbing activities will have on downgradient streams also impacted by the Pipeline. For example, some of these upland activities will increase sediment loading in the Gauley River and Stony Creek. *See, e.g., id*. at 232-33, 235. This could seriously impact the darter, which requires stream bottoms "with minimal sedimentation." *Id.* at 86. Yet the BiOp "leaves us guessing" at what these future activities are (beyond their "type"—e.g., forestry or commercial/industrial), their proximity to occupied streams or their tributaries, and their anticipated degree of sedimentation or pollution impacts on darter habitat. *Appalachian Voices*, 25 F.4th at 272. It appears that "necessary data

---

[9] FWS also fails to reconcile this conclusory assertion with its claim that a modeled 10% loss in forest cover over 25 years is "an extreme scenario." *Id*. at 235.

was available" to evaluate these impacts (in an appendix unavailable to the public[10]), but "simply not analyzed." *Greenpeace v. Nat'l Marine Fisheries Serv*., 80 F.Supp.2d 1137, 1149 (W.D. Wash. 2000).

Instead, FWS repeats its prior mistake and maintains that existing population and risk-projection models implicitly account for all of these future stressors in the action area. BiOp at 228-231, 233-35. FWS once again stretches the models "much too far." *Appalachian Voices*, 25 F.4th at 274. These "general population-level models" were "not designed to assess environmental characteristics and conditions at a smaller scale"—i.e., at the action-area level. *Id*. Moreover, "these 'relatively simple' models fail to include numerous factors that can impact the logperch and darter." *Id*. at 276 (citation omitted). *See also id*. at 275 (explaining that in 2018, FWS "forthrightly acknowledged that 'there is uncertainty associated with [its darter] model and some of the supporting data'") (citation omitted).

Accordingly, FWS cannot use these "*population-level* analyses" of extinction risk or resiliency "to pass for an evaluation of cumulative impacts within the 'action area.'" *Id*. at 276 (emphasis in original). For example, there is no credible argument that the modeling accounts for impacts to the darter *in this project's action area* from the 70 future activities (disturbing 2,360 acres) in the Gauley River HUC-12s, or the

---

[10] *See* BiOp at 221, 225-27 (referencing Appendix K to the revised Supplement to the Biological Assessment).

three activities (disturbing 218.2 acres) within the Pipeline's action area in the Stony Creek HUC-12.[11] BiOp at 232, 233. FWS's conclusion that these activities "are unlikely to significantly alter the [physical or biological features] of critical habitat," *id*. at 235, is also unsupported because the BiOp never analyzes their actual impacts. Under FWS's flawed approach, every biological opinion for any project that harms the darter—a highly imperiled species that is particularly sensitive to sedimentation—could simply rely on the 2018 modeling that this Court already found inadequate to arrive at a no-jeopardy conclusion, ignoring the harm to the species and its critical habitat from future activities that result in increased sedimentation. This approach is arbitrary and also at odds with the ESA's purpose "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184, (1978).

FWS's cumulative effects analysis for the bat species is likewise arbitrary. FWS predicts future activities will disturb 47,712.26 acres within the action area, and calculates this comprises 4.76% of the terrestrial action area. BiOp at 223, 224-25. FWS concludes "adequate habitat will remain" to maintain the species' viability in

---

[11] In addition, FWS admits that baseline habitat conditions "in and adjacent to the aquatic action area" in Stony Creek "might be more accurately characterized as moderate or marginally secure," suggesting that increased sediment would degrade already marginal habitat, but nonetheless "conclude[s] that the [Species Status Assessment]'s 'generally secure' rating for the Stony Creek population applies" in the action area, thereby ignoring that the affected areas are not, in fact, "secure." BiOp at 146.

the action area—and thus cumulative effects are "unlikely to significantly alter the baseline condition" of the affected populations. *Id*. However, this approach ignores that both bat species exhibit "strong site fidelity," which "contributes to the importance of forest *where the species actually occur[]*." *Id.* at 14, 71 (emphasis added). The BiOp sheds no light on how these activities will impact areas where the bats actually occur—e.g., whether they will destroy known habitat that "contributes to the conservation and recovery of the species at the population level." *Id.* at 128; *see also id*. at 71-72 ("Where Ibat colonies remain after [white-nose syndrome] has been present on the landscape for over 10 years, the importance of that particular occupied habitat for the remaining survivors…is magnified."); *Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 362 (4th Cir. 2019) ("known primary threats" include forest fragmentation).

In sum, FWS cannot properly add the Pipeline's effects and the cumulative effects of future activities to the baseline because it failed to evaluate the impact of those future activities. This omission is fatal because "cumulative effects can be the deciding factor in determining the likelihood of jeopardy or adverse modification." Ex. R at 4-32.

### E.    FWS Failed to Use the Best Available Science Regarding the Impact on Bats of Clearing Habitat.

When it vacated FWS's last biological opinion, this Court recommended that FWS "further explain why it anticipates no effects to the [I]bat from clearing more

than 1,000 acres of suitable but unoccupied summer habitat," in light of its prior conclusion "that the '*majority* of effects to [the bat]' from the nearby Atlantic Coast Pipeline 'will occur' from" clearing this habitat type. *Appalachian Voices*, 25 F.4th at 266 n.4 (alteration in original, citation omitted). FWS now claims its prior conclusion "erroneously assume[s] that the presence of cleared areas will harm migrating bats," and that in fact migrating bats will "simply fly across" the Pipeline right-of-way without expending "significant additional energy." BiOp at 15, 16. But the only study FWS cites for this proposition, White et al. (2017), actually says the opposite: it states that the northern long-eared bat[12] is a "a forest-dependent species" that "avoid[s] open areas" and "rarely ventures more than a few meters from the forest." Ex. S at 1, 8. That contradicts FWS's new position that encountering a 125-foot-wide cleared corridor would have no impact on migrating bats, including pregnant females. *See also* BiOp at 67 (explaining that "[c]onserving migrating bats" is a current focus of FWS). Accordingly, FWS has, once again, failed "to consider an important aspect of the problem," *Wild Virginia*, 25 F.4th at 928, to provide a "cogent explanation" for its changed position, *Defs. of Wildlife*, 931 F.3d at 363, and to rely on the best available science. 16 U.S.C. §1531(a)(2).

---

[12] FWS assumes the two bat species will "behave and use habitats in a similar manner when migrating." BiOp at 15.

## II.     Pipeline Construction Will Cause Irreparable Harm Absent a Stay

"In light of the stated purposes of the ESA…establishing irreparable injury should not be an onerous task for plaintiffs." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015). When it stayed the 2017 BiOp, this Court necessarily concluded that Pipeline construction activities would cause irreparable harm. That remains so today.

Absent a stay, MVP will engage in construction activities that will cause irreparable harm before resolution of this petition. For example, new grading, trenching, stream crossings, and other construction activities will increase sediment loads in streams, irreparably harming endangered species through direct mortality and habitat degradation. *See, e.g.*, BiOp at 279, 283 (predicting the project will degrade 21.8 km of logperch habitat and 3.0 km of darter habitat); Ex. T, ¶¶14-15, 17; Ex. U, ¶¶12, 16; Ex. V, ¶¶25-29, 32-35, 39-43, 46-50; Ex. W, ¶¶8-11, 18; Ex. X, ¶¶9, 16; Ex. Y, ¶¶15-18; Ex. AA, ¶¶9-13, 17; Ex. BB, ¶¶13-15, 22-23. The Court need not find an "imminent extinction threat" to a listed species before issuing a stay; "[t]he ESA accomplishes its purpose in incremental steps, which include protecting the remaining members of a species…. Harm to those members is irreparable[.]" *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818–19 (9th Cir. 2018). This harm to the species will, in turn, irreparably harm the interests of Petitioners and their members. Petitioners' members enjoy observing, searching for,

and studying the endangered species harmed by construction, and are injured by impacts that occur because of FWS's unlawful BiOp/ITS. *See, e.g.*, Ex. T, ¶¶10-16; Ex. U, ¶¶13-16; Ex. V, ¶38; Ex. W, ¶¶13-15; Ex. X, ¶¶9-13; Ex. Y, ¶¶ 5-8, 15-16; Ex. Z, ¶¶10-11; Ex. CC, ¶¶10-13.

MVP has publicly stated it intends to place its pipeline in service by the end of 2023.[13] Accordingly, without a stay, the Pipeline may very well be completed before this petition is resolved. In such circumstances, interim relief should be issued and the Court need not wait until the last minute. *Cf. Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216-17 (4th Cir. 2019).

## III.    The Balance of the Equities and the Public Interest Favor a Stay

The ESA "requires federal agencies 'to afford first priority to the declared national policy of saving endangered [or threatened] species'—even when this goal conflicts with agencies' 'primary missions.'" *Appalachian Voices*, 25 F.4th at 264 (quoting *Tenn. Valley Auth.*, 437 U.S. at 185). Accordingly, "when evaluating a request for injunctive relief to remedy an ESA [] violation, the equities and public

---

[13] Mike Tony, *Federal court throws out key DEP water permit for Mountain Valley Pipeline, calling agency's justifications "deficient,"* CHARLESTON GAZETTE-MAIL (April 3, 2023), https://www.wvgazettemail.com/news/energy_and_environment/federal-court-throws-out-key-dep-water-permit-for-mountain-valley-pipeline-calling-agencys-justifications/article_05b33e24-b7ce-557d-8468-c7d5f969022c.html.

interest factors always tip in favor of the protected species." *Cottonwood*, 789 F.3d at 1091.

A stay will not injure FWS. MVP may argue that a stay would result in economic harm, but temporary economic harm is far outweighed by irreparable harm to endangered species and the environment. *Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251, 264 (4th Cir. 2020) (finding irreparable environmental harm from pipeline construction outweighed more than $140 million in claimed unrecoverable economic harm in the balance of the equities). Moreover, the Court should not give weight to economic harm that may result from MVP's strategy of rushing to construct despite lacking required federal authorizations. MVP has consistently ignored this Court's admonition that, absent all such authorizations, a pipeline developer, "should it continue to proceed with construction, would violate FERC's certificate of public convenience and necessity." *Sierra Club*, 899 F.3d at 285 n.11.

For the same reasons, a stay pending review is in the public interest. *Cottonwood*, 789 F.3d at 1090 ("Congress established an unparalleled public interest in the 'incalculable' value of preserving endangered species"). *See also Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000).

## CONCLUSION

For the foregoing reasons, this Court should stay the BiOp/ITS pending judicial review.

DATED: April 27, 2023                    Respectfully submitted,

/s/ Elizabeth F. Benson
Elizabeth F. Benson
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
Telephone: (415) 977-5723
elly.benson@sierraclub.org

*Counsel for Petitioners Appalachian Voices, Wild Virginia, West Virginia Rivers Coalition, Preserve Giles County, Preserve Bent Mountain, West Virginia Highlands Conservancy, Indian Creek Watershed Association, Sierra Club, Chesapeake Climate Action Network, and Center for Biological Diversity*

/s/ Derek O. Teaney
Derek O. Teaney
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
dteaney@appalmad.org

/s/ Jared M. Margolis
Jared M. Margolis
Center for Biological Diversity
2852 Willamette St. #171
Eugene, OR 97405

Telephone: (802) 310-4054
jmargolis@biologicaldiversity.org

*Counsel for Petitioners Appalachian Voices,*
*Wild Virginia, West Virginia Rivers*
*Coalition, Preserve Giles County, Preserve*
*Bent Mountain, West Virginia Highlands*
*Conservancy, Indian Creek Watershed*
*Association, Chesapeake Climate Action*
*Network, and Center for Biological Diversity*

**CERTIFICATE OF COMPLIANCE**

1.      This motion complies with the type-volume limitation of Fed. R. App. P.

27(d)(2)(A) because this motion contains 5,196 words, excluding the parts of the

motion exempted by Fed. R. App. P. 27(d)(2) and Fed. R. App. P. 27(a)(2)(B).

2.      This motion complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

motion has been prepared in a proportionally spaced typeface using Microsoft

Word in Times New Roman 14-point font.

Dated: April 27, 2023

/s/ Elizabeth F. Benson
Elizabeth F. Benson

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2023, I electronically filed the foregoing Motion for Stay on behalf of Petitioners with the Clerk of Court using the CM/ECF System, which will automatically send e-mail notification of such filing to all counsel of record.

/s/ Elizabeth F. Benson
Elizabeth F. Benson